UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEPHEN SUMMERS,

     Plaintiff,

v.

WALGREEN CO.,

     Defendant.

Case No. 15-cv-12836
Honorable Laurie J. Michelson
Magistrate Judge Elizabeth A. Stafford

---

**OPINION AND ORDER
DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [21]**

---

Plaintiff Stephen Summers had a long career as a manager of different stores of Defendant Walgreen Co. But in 2012, his District Manager began pointing out performance issues that Defendant alleges were not resolved. As a result, the District Manager offered Summers the option to take a lower-level position at a different store, retire, or have his employment terminated for performance issues. Summers elected the third option, and shortly thereafter filed this lawsuit for age discrimination pursuant to federal and Michigan law. The Court has already dismissed Summers' federal age discrimination claim, and Defendant now moves for summary judgment on Summers' state-law age discrimination claim. For the reasons that follow, Defendant's motion will be DENIED.

**I.**

Plaintiff Stephen Summers was born on February 1, 1948. (R. 22-2, PID 476.) He started his Walgreen Co. career in 1991, working as an Assistant Manager at a store in East Texas. (R. 21-3, PID 169.) He was eventually promoted to Store Manager, and from 1998 on, served as

Store Manager at various Walgreens locations. (*Id.*) In 2008, he became the Store Manager for the Highland, Michigan location. (*Id.* at PID 173.)

### A.

In Summers' role as Store Manager, his objective was "To improve store sales, profitability, and image through proper merchandising, protection of store assets, the selection, training, and development of team members, and modeling and delivering a distinctive and delightful customer and patient experience." (R. 21-3, PID 174; R. 22-2, PID 394.) He supervised all store personnel, which included the Assistant Store Manager, Pharmacy Manager, Pharmacists, Shift Leads, and hourly associates. (R. 21-2, PID 161.) In turn, Summers reported to his District Manager, Greg Hansard, who was responsible for oversight of all stores within the district (i.e., all stores within a given area). (*Id.*) In addition, other area store managers would serve as Community Leaders, performing unannounced walk-throughs of other stores in order to provide feedback. (*Id.* at PID 162.)

### B.

Summers experienced a few instances of discipline while working at Walgreen Co. In 2004, he was disciplined by loss prevention for consuming candy that was designated for disposal as unwanted. (R. 21-3, PID 175.) In 2009, he was issued a verbal warning by loss prevention for using a UPC code for discounted merchandise, which resulted in the inadvertent alteration of the tax information for those products. (*Id.*) In 2010, Hansard issued Summers a written warning after Summers told a subordinate that he "looked like he was gay," and Hansard issued a verbal warning after Summers revealed to store staff that a fellow employee was pregnant. (R. 21-3, PID 176.) And in 2011, Hansard issued Summers a "final written warning" after Summers grabbed a female subordinate's arm. (R. 21-3, PID 177.)

Despite this disciplinary history, the parties' briefing focuses more on Summers' performance evaluations and performance improvement plans in the years leading up to his termination. Briefly, the Walgreen performance review system asks District Managers to rate employees in areas falling into three categories: Performance, Development, and Competency. (R. 22-2, PID 441.) The ratings system is as follows: N/A (too new to rate); 1 (not achieving expectations); 2 (partially achieving expectations); 3 (achieving expectations); 4 (exceeding expectations); 5 (outstanding). (*Id.*) Both the supervisor and the employee fill out the forms; thus, there is a supervisor rating and a self-rating in each report.

For Summers, issues began to arise in the evaluation period between September 1, 2011 and August 31, 2012. Although Hansard rated Summers an overall 3.3 (achieving expectations), he rated Summers' "Functional Competency" at 2 (partially achieving expectations). (R. 21-3, PID 278.) Hansard commented, "You are very good at empowering your team and delegating to them. Don't be too hands off so that they are not followed up with and given feedback." (R. 21-3, PID 278.) In addition, Hansard pointed out that store merchandise "at times lacks impact." (*Id.*) He instructed Summers to promote the in-store pharmacy in order to "drive the business" and "[k]eep store condition sharp and crisp [at] all times." (*Id.*)

A few months after this evaluation period, on January 3, 2013, the Community Leader for Summers' store completed a Community Leader Evaluation, which he e-mailed to Hansard. A Community Leader is a fellow store manager within the same district who would make scheduled visits and report back to Hansard regarding store conditions. (R. 22-4, PID 719.) This particular evaluation read as follows: "Sales floor a 1. Many holes. . . . No front window signs. Managers spending time in Pharmacy. Scanouts most likely not being performed. Many items from my walk 12-14-12 still not done." (R. 21-3, PID 285.) The Community Leader returned on

January 16, 2013. (*Id.* at PID 286.) He reported to Hansard the following: "Scanouts" were still not being done, daily notes to employees were not being written, and several expired food items were still on the sales floor. The Community Leader concluded, "This store is missing a ton of sales because of the poor instock condition." (*Id.*) Summers testified that he couldn't recall these particular issues—"I considered store issues an ongoing thing. Store issues always happen, and we just worked through them and correct them as we go. I didn't put a lot of . . . emphasis on store issues other than they're always going to happen day in, day out, and you take care of them as you go." (R. 21-3, PID 179.)

Nonetheless, on March 3, 2013, Hansard initiated a Performance Improvement Plan. Under "Explanation for Current Discipline," Hansard wrote, "Failure to perform job duties. Competencies include People Leadership, Operations Leadership, and Functional Capacity." (R. 21-3, PID 289, 295.) Additionally,

> Steve is given a written warning for failure to perform job duties. Communication with team members including coaching, giving specific information[] and follow up [is] not being addressed. Execution is not meeting expectation by failing to complete notes left by RX supervisor, Community Leader, and District Manager in a timely manner. Steve [is] not aware of what is happening in his pharm[a]cy and is not involved in driving execution on a daily basis. Failure to improve in the above areas will result in further disciplinary action.

(R. 21-3, PID 290.) Among Hansard's goals for Summers were: communicate with pharmacy staff and keep current on pharmacy operations on a daily basis, complete all notes, tasks and direction in a timely manner, and communicate with team personally on a daily basis. (*Id.*)

Hansard completed a follow up on May 23, 2013. (*Id.* at PID 298.) He concluded, "Performance has improved and performance plan was met. If performance falls back and does not meet expectations, final written warning can be issued." (*Id.* at PID 299.)

Summers' next performance review, for the time period between September 1, 2012 and August 31, 2013, resulted in an overall rating of 3.0. (*Id.* at PID 317.) However, Hansard observed, "Merchandising can be poor at times. . . . Work on backing the ad, you can be complacent when you run out." (*Id.* at PID 313.) Hansard also instructed Summers, "Work with your team to develop them. You delegate these tasks often and this is your role with field transformation. You should be working one on one with them to teach them." (*Id.* at PID 314.)

The following year (the period September 1, 2013 to August 31, 2014), Hansard rated Summers an overall 2.8. (*Id.* at PID 319.) Hansard commented,

> Your store condition is often below standard. . . . I don't sense you are walking the store in detail daily and you delegate much of this to others without following up. . . . You empower others well, the missing link is you don't follow up and see how they are doing and give feedback and hold them accountable.

(*Id.* at PID 323.) But Summers saw his ability to delegate as a positive: "I was probably one of the best delegators in the whole district. You can . . . ask Mr. Hansard . . . how good was I at delegating. I was very good. . . . I always directed on how the store should go or the plans for the week, the day." (R. 21-3, PID 183.)

In October 2014, Hansard put Summers on another performance improvement plan. (R. 21-3, PID 332–33.) Under related disciplinary issues, Hansard reported that employees were writing their own notes instead of Summers doing it, there was little direction from Summers, there were issues with store condition, coaching cards were not being completed, an A frame sign at the front of the store had not been removed despite a request to do so months earlier, incidents of short staffing in March, June, and August 2014, and poor merchandising ("an ongoing issue"). (*Id.*) Hansard issued a written warning as follows:

> Steve is issued a written warning for failure to follow thru with notes and directions on Compass, DM and CL. Steve must improve store condition by making daily notes and communication with his team. Steve is to follow

marketing guide . . . . Merchandising and displays are expected to be timely and full. . . . Steve is expected to staff his store and run his payroll budget.

(*Id.*)

After a follow-up, Hansard issued a final written warning, noting several ongoing issues regarding merchandising and store promotions. Hansard wrote:

Steve is issued a final written warning for not complying with action items and follow thru outlined in his PIP. Steve is expected to comply with plan and follow thru with company and district direction. Failure to follow thru will result in further disciplinary action including termination.

(*Id.* at PID 343.) Hansard acknowledged at his deposition that there was a time in 2014 that Summers did not have an Assistant Manager for the store. (22-4, PID 768.) However, Summers admitted at his deposition that stocking shelves would ultimately be his responsibility as the Store Manager. (R. 21-3, PID 193.)

Eventually, it appears that Hansard decided it was time to either terminate Summers or adjust his role. Before meeting with Summers, Hansard had a discussion with Norma Gonzales, a Walgreen Employee Relations Specialist. Gonzales e-mailed Hansard with "the information on Stephen Summers that you will need for the discussion with him[.]" (R. 22-2, PID 476.) Among the information Gonzales shared was Summers' date of hire and date of birth. (*Id.*) Gonzales noted, "I checked with Benefits, if he leaves before the 25th year anniversary he will not qualify for retiree health benefits—which is valued as a benefit of $10,000/year." (*Id.*) She concluded, "You may want to ask him what his goals are regarding his career at Walgreens, this may help flush out his retirement intentions." (*Id.*)

On January 9, 2015, Hansard met with Summers and told him that because of his performance, he had three options moving forward: continue at Walgreens as a Team Leader in a different store, use Paid Time Off as a "bridge" to his 25-year anniversary with Walgreens,

which would have given him an enhanced retirement option with medical coverage, or be terminated for unsatisfactory performance. (R. 21-3, PID 195.) Summers requested time to discuss the options with his financial advisor. (R. 21-3, PID 352.) On January 19, 2015, Summers notified Hansard that he was going to opt for termination of employment. (R. 21-3, PID 252.)

On January 20, 2015, Summers emailed again for "clarification[]," noting that "the message [electing the third option] was made under protest stating the option least offensive, but these were the only options offered with respect to my manager duties, but not what I want, which is continued manager employment." (R. 21-3, PID 354.) Hansard responded on January 21, 2015:

> I would like to point out that after this past years [*sic*] unsatisfactory performance and poor performance evaluation you were issued a 30 day PIP, which was extended an additional 30 days. You could have had 'continued management' employment if you had significantly improved and maintained your performance, which did not happen.

(*Id.*)

Summers testified that he was replaced by Jennie Chandler, who is "in her 40s." (R. 21-3, PID 203.) At that time, Chandler, born October 20, 1967, was in her late 40s. (R. 22-5, PID 846.) Summers has also identified several other younger Store Managers who he says had similar evaluations but were never placed on performance plans or terminated: Kevin Hass, Andrea Gamblin, and Eric Krogsrud. (R. 22, PID 379–80.) Summers has also testified regarding several comments Hansard made to him, which Summers believes represented an age bias.

## C.

Summers filed suit in this Court on August 12, 2015. (R. 1.) His original complaint asserted a count of age discrimination under the Federal Age Discrimination in Employment Act

("ADEA") and Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), a count of wrongful termination under Michigan state law, and a count of breach of contract. (*Id.*) This Court granted Defendant's motion to dismiss the federal age discrimination claim, and ordered Summers to file an amended complaint addressing other pleading deficiencies. (R. 7, PID 62.) Summers did so on May 10, 2016. (R. 10.) Plaintiff's amended complaint asserts a single count of age discrimination in violation of ELCRA, pursuant to diversity jurisdiction. (R. 10, PID 72.) Defendant now moves for summary judgment on that claim. (R. 21.) After careful consideration of the briefs and thorough review of the pleadings, the Court finds that oral argument will not aid in resolving the pending motion. *See* E.D. Mich. LR 7.1(f)(2).

## II.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party may discharge its initial summary judgment burden by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party does so, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to a jury, or whether the evidence is so one-sided that the moving party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

**III.**

Summers asserts a claim of age discrimination pursuant to Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), Michigan Compiled Laws § 37.2202(a). Prior to 2009, courts in this circuit analyzed age discrimination claims under the federal Age Discrimination in Employment Act ("ADEA") and ELCRA under the same standard, with the ultimate burden being proof that age was a "substantial" or "motivating" factor in the employer's decision. *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524 (6th Cir. 2007). In *Gross v. FBL Financial Services*, 557 U.S. 167, 177–78 (2009), however, the Supreme Court held that "[u]nlike Title VII, the ADEA's text does not provide that a plaintiff may establish discrimination by showing that age was simply a motivating factor. . . . therefore, a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision." *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 174, 129 S. Ct. 2343, 2349 (2009). "In contrast to the ADEA's 'but-for' causation burden, under the ELCRA a plaintiff must ultimately prove that the defendant's discriminatory animus was a 'substantial' or 'motivating' factor in the decision." *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 818 (6th Cir. 2011).

The parties do not dispute the ultimate burden here. And regardless of the ultimate burden, where a plaintiff proceeds based on circumstantial evidence,[1] the same analytical framework applies to both ADEA and ELCRA claims. *Provezano*, 663 F.3d at 818. "Circumstantial evidence . . . is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Wexler*

---

[1] Defendant predicted in its motion that Summers would attempt to use three statements by Hansard as direct evidence of discrimination. (R. 21, PID 147.) Summers did not respond to this argument in his response brief, instead relying on the circumstantial approach. (R. 22, PID 383.) Because the Court will deny summary judgment based on that approach, it is unnecessary to address direct evidence.

*v. White's Fine Furniture*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc) (citing *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)). Where an ELCRA plaintiff relies on circumstantial evidence, "the familiar analysis" from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies. *Tilley v. Kalamazoo Cty. Rd. Comm'n*, 777 F.3d 303, 308 (6th Cir. 2015). Under this framework, Summers must first establish a prima facie case of discrimination. *See id.* If he succeeds, the burden then shifts to Walgreen "to articulate a legitimate nondiscriminatory reason for the adverse employment action." *See id.* (quoting *Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 264 (6th Cir. 2010)). Summers would then have the burden to "show that [Walgreen's] explanation was a mere pretext for intentional age discrimination." *See id.*

## A.

To make out a prima facie case, Summers must show, "(1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment decision; and (4) he was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008); *see Lytle v. Malady*, 579 N.W.2d 906, 914 (Mich. 1998) (describing the fourth element as requiring a showing that plaintiff "was discharged under circumstances that give rise to an inference of unlawful discrimination" but affirming that the test is "an adaptation" of *McDonnell-Douglas*). The parties dispute all but the first element.

As to Summers' job qualifications, "a court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case." *Wexler*, 317 F.3d at 574; *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 586 (6th Cir. 2002) (applying this rule in an ELCRA case). Yet the only evidence Defendant raises in

order to dispute that Summers was qualified for his position is that Summers received poor performance reviews. (R. 21, PID 151.) This is the same evidence Defendant cites as its legitimate nondiscriminatory reason for terminating Summers. (*Id.* at PID 153.) Moreover, Summers worked for Defendant for over 20 years, rising through the ranks and managing other Walgreens stores before landing at the Highland, Michigan store, which raises a genuine issue of material fact as to whether he was qualified. *See Cicero*, 280 F.3d at 586 ("While prior work history is not probative at the second and third stages of the *McDonnell Douglas* test, common sense dictates that it is relevant at the prima facie stage for determining whether an employee has at least the minimum attributes needed to perform the position.").

Next, "in order for an employment action to be adverse . . . (1) the action must be materially adverse in that it is more than mere inconvenience or an alteration of job responsibilities, and (2) there must be some objective basis for demonstrating that the change is adverse[.]" *Wilcoxon v. 3M*, 597 N.W.2d 250, 258 (Mich. Ct. App. 1999) (citation and internal quotation marks omitted). Such an action

> typically . . . takes the form of an ultimate employment decision, such as 'a termination in employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.'

*Pena v. Ingham Cty. Rd. Comm'n*, 660 N.W.2d 351, 358 (Mich. Ct. App. 2003) (citation omitted).

In a footnote, Defendant asserts that because "Plaintiff, following a decision with his financial advisor, chose to be separated from his employment rather than maintain his employment status," there was no adverse employment action. (R. 21, PID 145 n.3.) But the footnote does not address the fact that Summers chose this option as the "least offensive" among

11

three: become a Team Leader at a different store, retire and use leave time to leave his employment immediately, or be terminated. Any of these three options could be considered materially adverse: Summers was forced to either take a demotion (with a related pay cut (*Compare* R. 22-4, PID 815 (testimony by Hansard stating that the Team Leader/shift lead position would pay $12 to $16 per hour) *with* R. 22-2, PID 475 (Summers' 2014 tax return, stating that he earned $96,178 that year)), retire and use leave time to stop work immediately (i.e., involuntarily abdicate all management responsibilities), or be terminated. Because Summers was forced to pick from three actions that are adverse under Michigan law, he has satisfied the adverse action element of his prima facie case.

Lastly, it is undisputed that Summers' replacement, Jennie Chandler, is almost twenty years younger than he is. "Unlike the federal Age Discrimination in Employment Act, ELCRA imposes no age forty protected class limitation in ELCRA age discrimination actions[.]" *Gibbs v. Voith Indus. Servs.*, 60 F. Supp. 3d 780, 793 (E.D. Mich. 2014) (citation omitted). Thus, Michigan courts have held the prima facie case satisfied with an age difference of seventeen years. *Barnell v. Taubman Co.*, 512 N.W.2d 13, 19 (Mich. 1993). The Court finds that Summers has satisfied this element of the prima facie case.

**B.**

With the prima facie case satisfied, the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for Summers' discharge. "Terminating an employee because he fails to perform satisfactorily is a legitimate and nondiscriminatory reason to end his employment." *Cicero*, 280 F.3d at 588. To that end, Defendant says that Summers' performance was inadequate, citing the two PIPs as well as poor performance reviews in the years leading up to Summers' discharge. Specifically, Summers' 2014 PIP was his second in approximately 18

months, and identified the following issues: improper delegation of notes, unacceptable store condition, failure to address issues that had been raised, short staffing, failure to stay current with resets and revisions, and poor merchandising. (R. 21-3, PID 332.) Hansard testified that Summers' failure to meet the expectations of this PIP is what made him contemplate terminating Summers. (R. 22-4, PID 814.) Hansard had previously raised issues identified in the PIP in Summers' 2013 and 2014 performance reviews, especially the issue of delegating management responsibilities to subordinates.

## C.

Once Defendant has articulated a legitimate, non-discriminatory reason for terminating Summers, it is Summers' burden to show pretext. "At this stage, the plaintiff has the burden to produce 'sufficient evidence from which a jury could reasonably reject [the employer's] explanation of why it fired [him].'" *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012) (citation omitted). To do this, Summers "must demonstrate 'that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.'" *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 532 (6th Cir. 2007) (citation omitted). Summers proceeds on the second and third alternatives, asserting that several younger Store Managers also supervised by Hansard had similar performance evaluations but were never terminated or placed on performance plans. Defendant responds that these employees were not similarly situated to Summers, and what is more, older employees who received "similar or worse" overall reviews than Plaintiff were not placed on a performance improvement plan or terminated.

"Where an employer argues that the plaintiff's differential discipline was justified by material differences in context, [courts] evaluate whether that justification is pretextual by

looking to the same or similar factors as when evaluating the 'similarly situated' element of the prima facie case." *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 779 (6th Cir. 2016) (citing cases). However, pursuant to *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 255 (1981), "the factual inquiry proceeds to a new level of specificity" at the pretext stage. This does not mean that the Court can increase a plaintiff's burden of proof, but rather, that the "light review" conducted at the prima facie stage must be distinguished from the "more rigorous comparison conducted at the later stages" of the analysis. *Provenzano*, 663 F.3d at 814.

With these cautionary holdings in mind, the Court turns to the pretext analysis. The Sixth Circuit has held that an employee can show pretext by "comparing [the] purported reasons for [the adverse employment action] with [the employee's] previous performance evaluations, as well as the performance evaluations of others who were [not subjected to the adverse employment action]." *Henry v. Abbott Labs*, 651 F. App'x 494, 502 (6th Cir. 2016). Demonstrating pretext through comparison "ordinarily . . . consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Jackson*, 814 F.3d at 779–80. Defendant urges that this means that "comparable non-protected employees 'must be similarly-situated in all respects.'" (R. 23, PID 900 (citing *Gibbs v. Voith Indus. Servs., Inc.*, 60 F. Supp. 3d 780, 795 (E.D. Mich 2014)). It is true that the *Gibbs* decision cited *Mitchell v. Toledo Hospital*, 964 F.2d 577, 582 (6th Cir. 1992).

But in *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998), the Sixth Circuit clarified that the *Mitchell* holding should not be interpreted narrowly: instead of demonstrating an "exact correlation," "the plaintiff and the employee with whom the plaintiff

seeks to compare himself or herself must be similar in 'all of the *relevant* aspects.'" (emphasis added). "*Ercegovich*'s relevancy requirement is no less applicable in the pretext stage of [the] analysis than it [is] in the prima facie case stage." *Jackson*, 814 F.3d at 782. Specifically,

> In the context of personnel actions, the relevant factors for determining whether employees are similarly situated often include the employees' supervisors, the standards that the employees had to meet, and the employees' conduct. . . . But the weight to be given to each factor can vary depending upon the particular case.

*Johnson v. Kroger Co.*, 319 F.3d 858, 867 (6th Cir. 2003).

Every comparator Summers points to here was also a store manager working within Hansard's district (such that Hansard was their District Manager). And while Hansard and Summers both testified that Community Leaders had some input when it came to performance evaluations (R. 22-4, PID 718–19; R. 21-3, PID 179), PIPs issued directly from Hansard (*see, e.g.*, R. 21-3, PID 288), and record evidence suggests that Hansard was directly responsible for termination decisions as well (*see* R. 23-1, PID 911). In addition, Walgreens' PIP policy appears, on its face, to apply the same way to everyone. In particular, the policy contemplates (1) verbal counseling, (2) a Performance Improvement Plan, and (3) termination. (R. 22-2, PID 482–83.) "A Performance Improvement Plan (PIP) is required anytime management initiates written discipline for performance-related issues," though the policy specifies that "[t]his only applies to leadership positions in the stores (MGR, ASM, ASM-T, SFL) . . . ." (*Id.*) But it appears that a PIP can also be initiated "when a team member has not responded effectively after verbal counseling . . . has a serious performance issue that warrants more than Coaching for a first response; or has recently received a performance rating on the annual performance review that demonstrates serious performance concerns." (*Id.*)

It would seem that at least four younger store managers had performance issues similar to Summers', but were not placed on PIPs. Jeanne Chandler (20 years younger than Summers (R.

22-5, PID 846)) received an overall rating of 2.8 on her September 1, 2014 to August 31, 2015 performance review (the year she replaced Summers). (R. 22-2, PID 529.) Chandler received several 2 ratings in the areas of customer delight, payroll, inventory, and shrink. (*See id.* at PID 518–29) However, she received a rating of 3 for "functional competency"—Hansard instructed, "Focus on detailed notes and empowerment." (R. 22-2, PDI 522.) Kevin Hass (17 years younger than Summers (R. 22-8, PID 893)) received an overall rating of 2.7 on his September 1, 2013 to August 31, 2014 performance review. (R. 22-2, PID 542.) He received a score of 2.8 in his competency review. (R. 22-2, PID 542.) Andrea Gamblin (18 years younger than Summers (R. 22-8, PID 893)) received an overall rating of 2.8 on her September 1, 2013 to August 31, 2014 performance review. (R. 22-2, PID 498.) This included a functional competency rating of 2, and a comment from Hansard that she should "make good detailed notes daily and communicate to your team the need to get these done." (R. 22-2, PID 491, 493.) Finally, Eric Krogsrud (15 years younger than Summers (R. 22-8, PID 894) and also a community leader (R. 22-2, PID 500)) received an overall rating of 2.5 on his September 1, 2013 to August 31, 2014 performance review. (R. 22-2, PID 514.) This included a competency rating of 2.5. (*Id.*) Yet, none of these individuals were placed on PIPs.

Defendant has an explanation for this discrepancy: of the three categories (Performance, Development, and Competency), Competency is the one that matters when it comes to initiating PIPS or termination. To that end, Hansard explained in his declaration that he "place[s] emphasis upon the Competency Review component in determining whether a Store Manager should be placed on a Performance Improvement Plan[.]" (R. 23-1, PID 910.) This explanation emerged in Defendant's reply brief, so it is unclear whether Plaintiff disputes that it is true. And Defendant points to nothing else in the record to support that this evaluation factor is more important than

the others. Nothing in the Walgreen disciplinary policy suggests that Competency is the focus when initiating discipline. To the contrary, the policy is framed in terms of "performance-related issues," which suggests reference to the performance review as a whole or the Performance aspect of the performance review. (*See* R. 22-2, PID 482–83.) Nonetheless, Hansard testified at his deposition that "what led up to the Performance Improvement Plan were [Summers's] competency ratings in 2013." (R. 22-4, PID 749–50.)

Case law in Michigan and elsewhere in this circuit supports the idea that an employer can zero in on one aspect of a performance review in order to decide whether discipline is warranted. On a general level, "rais[ing] questions about [the employer's] business judgment" does not ordinarily suffice to establish pretext. *Town v. Mich. Bell Tel. Co.*, 568 N.W.2d 64, 72 (Mich. 1997). And the Sixth Circuit has held, in the context of an employer's interpretation of its own rules, the mere fact that an employer "might 'benefit from developing a more detailed policy'" (in this case, specifying that Competency is what triggers PIPs) is not enough to demonstrate pretext. *Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 560 (6th Cir. 2009) (applying federal and Tennessee law, quoting *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 398 (6th Cir. 2008) (applying federal and Kentucky law)). And in *Conley v. U.S. Bank National Association*, 211 F. App'x 402, 408 (6th Cir. 2006) (applying federal and Ohio law), the Sixth Circuit did not question the employer's focus on certain categories in a "Peer-Group Analysis" to determine who was the "least-effective relationship manager relative to the others" in the context of a reduction in force.

But in this case, even assuming that Hansard did properly rely on the Competency score in deciding whether to initiate PIPs or termination, the discrepancies in treatment between Summers and his comparators actually become *more* pronounced. Again, the year before being

terminated (FY 2014), Summers received a Competency score of 2.5. (R. 21-3, PID 329.) Chandler received an overall Competency score of 3 the year she replaced Summers (FY 2015). (R. 22-2, PID 529.) Hass received an overall Competency score of 2.8 in FY 2014. (R. 22-2, PID 542.) Gamblin received an overall Competency score of 2.8 in FY 2014. (R. 22-2, PID 498.) And Krogsrud received an overall Competency review of 2.5 in 2014. (R. 22-2, PID 514.) It would seem that Hass, Gamblin, and Krogsrud were at least comparable to Summers in that all four were "partially achieving expectations" in the Competency area. Yet, only Summers was placed on a PIP (and eventually terminated). Again, a focus on one component of an employee's overall score may be permissible when applied across the board—but a reasonable jury could find that is not what happened here. *Cf. Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 619 (6th Cir. 2003) ("[A]t first blush, the fact that two panel members gave Sutherland a score that was half of the score they gave to Famuwera appears suspicious. But this suspicion is eliminated when we recall that Famuwera was awarded his promotion based not on the score he received for one question, but based on his total score.").

And the additional, younger employees Hansard says he terminated do not appear to fit into Defendant's Competency-focused rationale. (R. 23-1, PID 911.) Store Manager Thomas Goodwin was placed on a PIP in November 2013, and terminated at age 33 in April 2014, "due to performance deficiencies." (*Id.*) Store Manager David Kepler was placed on a PIP in January 2013, and terminated at age 32 in April 2013, "due to performance deficiencies." (*Id.*) Hansard terminated Edward Fletcher III in 2015 at age 45, "due to performance deficiencies." (R. 24, PID 913.) While the record shows that Fletcher was assigned an overall Competency rating of 2.8, it is silent as to Goodwin's and Kepler's Competency rating. Yet, as noted, Hansard weighed most heavily the Competency Review component.

So this brings the Court back to the beginning of the pretext analysis—there is evidence to show that Summers was similarly situated to younger employees in the respect that *Defendant* deems most relevant, yet he was treated differently. The Court finds that this is enough to create a fact issue on pretext. *See Reynolds v. Chipotle Mexican Grill, Inc.*, 120 F. Supp. 3d 704, 724 (S.D. Ohio 2015) (applying federal and Ohio law). Moreover, Defendant cited *Howley v. Fed. Express Corp.*, 173 F. Supp. 3d 531, 549 (E.D. Mich. 2016), *reversed*, 2017 U.S. App. LEXIS 4760 (6th Cir. Mar. 15, 2017) for the following proposition: "Even if the [employer's] disciplinary decisions were perceived as somewhat harsh, that does not provide a legal basis for concluding that the same actions were motivated by age animus, at least in absence of something more." Though the district court decision was good law at the time Defendant filed its brief, it has since been reversed. In reversing the district court's decision, the Sixth Circuit found that the fact that plaintiff had been disciplined for using inappropriate language in the workplace while "employees who were considerably younger than him used inappropriate language in the workplace all the time" was sufficient to satisfy the prima facie case. *Howley v. Fed. Express Corp.*, No. 16-1559, — F. App'x —, 2017 U.S. App. LEXIS 4760, at *16 (6th Cir. Mar. 15, 2017). And pretext was established by the "suspicious circumstances surrounding Howley's termination" and "further buttressed by the age-related comments" that Howley's supervisor had made to her and other employees. *Id.*

Similarly here, Summers did point to some comments by Hansard over the years that might suggest some age-based animus. First, when Hansard gave Summers his 20-year pin (presumably in or around 2008), "he mentioned that, you know, here's your 20-year pin. 'You probably have another good—you know, five good years left in you to reach retirement.' And right away I—you know, I thought, well, he's putting an expiration date on my employment."

(R. 21-3, PID 188.) Second, during Summers' 2014 review, Hansard asked Summers "when he was going to retire." (R. 21-3, PID 187.) Third, in 2014, Hansard told Summers that "if I push a certain program or do certain things, that the other younger store managers would follow my lead." (R. 21-3, PID 187.) Standing alone, these comments might not rise to the level of direct evidence of age discrimination. *See Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 478 (6th Cir. 2002) (stating that one factor to consider in evaluating such comments is whether the statements were "vague, ambiguous, or isolated remarks"). But such comments can still be relevant at the pretext stage. *See Bartlett v. Gates*, 421 F. App'x 485, 491 (6th Cir. 2010) ("While discriminatory remarks can constitute direct evidence, they also serve as probative evidence of pretext.").

"'[I]n evaluating the relevancy of discriminatory remarks' as part of a pretext analysis, '[courts] examine[] the identity of the speaker,' as well as 'the substance of the remarks.'" *Clack v. Rock-Tenn Co.*, 304 F. App'x 399, 404 (6th Cir. 2008) (quoting *Hopkins v. Electronic Data Sys. Corp.*, 196 F.3d 655, 665 (6th Cir. 1999)). Here, Hansard was the decisionmaker, and the remarks, while ambiguous, could potentially support an inference that Hansard hoped Summers would soon retire. Two of the remarks involved observations about Summers' potential to retire in the coming years—concerns also identified by Hansard to Gonzales. The third remark, however, appears to be a compliment to Summers' leadership as a more tenured employee.

In sum, the Court does not discern overwhelming evidence of age discrimination in this case. Indeed, it appears that Hansard may have merely been trying to help Summers transition out of a job that he perceived was not well suited to him anymore. But presenting overwhelming evidence of age discrimination is not Summers' burden on summary judgment. His burden is to raise a genuine issue of material fact pursuant to the *McDonnell-Douglas* burden-shifting

framework. Given Defendant's somewhat-ineffective explanation for the discrepancies between Summers and his comparators and the remarks by Hansard, the Court finds Summers has met that burden. Accordingly, Defendant's summary-judgment motion must be denied.

## IV.

For the reasons set forth above, IT IS ORDERED that Defendant's motion for summary judgment is DENIED.

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
Dated: June 15, 2017                            U.S. DISTRICT JUDGE

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 15, 2017.

s/Keisha Jackson
Case Manager